UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| CARLOS GONZALEZ,<br>                Plaintiff,<br><br>    v.<br><br>PUROLITE CORPORATION,<br>                Defendant. | :<br>:<br>:<br>:<br>:   CASE NO. 2:17-cv-2983-PBT<br>:<br>:<br>: |

### CONCISE STATEMENT OF STIPULATED MATERIAL FACTS

Pursuant to this Court's policies and procedures, Defendant Purolite Corporation ("Purolite") hereby files this concise statement of the material facts which the parties have stipulated to for purposes of summary judgment.

**I.    Background on Purolite**

    **A.    Overview of Purolite**

1.    Purolite is a chemical manufacturing company with headquarters in Bala Cynwyd, Pennsylvania.  (Brodie Dep. at 9.[1])

2.    Purolite manufactures a specialty product called an ion exchange resin which is used for water treatment and treatment of other liquids and gases.  (Brodie Dep. at 9.)

3.    Purolite's domestic manufacturing site is located at 3620 G Street in Philadelphia, Pennsylvania (hereinafter, "the Plant").  (Brodie Dep. at 8.)

4.    The Plant has three production departments:  Regen; Copolymer; and Cation Resin.  (Jarnagin Dep. at 15-16.[2])

5.    Each production department employs First Operators and Second Operators. (Jarnagin Dep. at 12.)

---

[1] A true and correct copy of the relevant portions of Jacob Brodie's Deposition ("Brodie Dep."), conducted on January 30, 2018, is attached hereto as <u>Exhibit 1</u>.

[2] A true and correct copy of the relevant portions of Warner Jarnagin's Deposition ("Jarnagin Dep."), conducted on January 30, 2018, is attached hereto as <u>Exhibit 2</u>.

6. The First Operator position is a higher-level position than the Second Operator position. (Jarnagin Dep. at 12.)

7. The First Operator position requires the employee to operate machinery, reactors, and processing tanks, and follow detailed operating and production procedures. (Jarnagin Dep. at 12-13.)

8. Although the First Operator position is considered more "cerebral," and the Second Operator position more physical, both the First and Second Operator positions are physically demanding. (Jarnagin Dep. at 12-13.)

9. First and Second Operators work a rotating four-day schedule: four days on night shift; four days off; four days on day shift; four days off. (Pl. Dep. at 161-63.[3])

**B.    Purolite's Employment Policies**

10. Purolite's written policies and procedures for Plant employees are set forth in Purolite's Plant Employee Handbook (hereinafter, "the Handbook"). (Exh. 4.[4])

11. Plaintiff Carlos Gonzalez ("Mr. Gonzalez") (Hispanic) acknowledged his receipt of the Handbook. (Pl. Dep. at 120-21; Exh. 5.[5])

12. The Handbook states: "Purolite has an Open Door policy; employees can raise any concerns and communicate with senior management without fear of reprisal." (Exh. 4 at Gonzalez-18.)

13. Purolite maintains an Equal Employment Opportunity ("EEO") Policy. (Exh. 4 at Gonzalez-18.) The policy states: "Any employee with questions or concerns about any type of

---

[3] A true and correct copy of the relevant portions of Carlos Gonzalez's Deposition ("Pl. Dep."), conducted on January 4, 2018, is attached hereto as Exhibit 3.
[4] A true and correct copy of the Purolite Plant Employee Handbook is attached hereto as Exhibit 4, Gonzalez-14-48.
[5] A true and correct copy of Carlos Gonzalez's Acknowledgment of receipt of the Purolite Plant Employee Handbook is attached hereto as Exhibit 5, PUROLITE-000025.

discrimination in the workplace is encouraged to bring these issues to the attention of their immediate supervisor, the Human Resources Department, or senior management immediately." (Exh. 4 at Gonzalez-18-19.)

14. Purolite also maintains a Non-Harassment Policy which "asks any employee who experiences or witnesses . . . harassment . . . to report it immediately to his/her supervisor or the Human Resources Department." (Exh. 4 at Gonzalez-19-20.)

15. Purolite's Workplace Violence Prevention Policy states: "Anyone determined to be responsible for threats of (or actual) violence . . . will be subject to prompt disciplinary action, up to and including termination of employment." (Exh. 4 at Gonzalez-20-21.)

**C. Safety**

16. Purolite's Handbook includes a section on "Workplace Safety." (Exh. 4 at Gonzalez-34.) It states: "The safety of our employees is of vital concern; thus, it is the policy of Purolite to comply with all applicable federal, state, and local health and safety regulations and to provide a work environment as free as practicable from recognized hazards." (Exh. 4 at Gonzalez-34.)

17. The Handbook instructs employees to "report any unsafe conditions or circumstances to their supervisor or safety coordinator to prevent accidents." (Exh. 4 at Gonzalez-34.)

18. Mr. Gonzalez understood he was to report unsafe conditions at Purolite. (Pl. Dep. at 137.)

19. Purolite held regular safety meetings for its employees. (Pl. Dep. at 147-48.)

20. Purolite also has a "safety committee" which meets on a regular basis. (Pl. Dep. at 148.)

21. On one occasion, Mr. Gonzalez's supervisor, Andre Hernandez ("Mr. Hernandez") (Hispanic), asked Mr. Gonzalez to attend a safety committee meeting to discuss a piping issue in the Plant. (Pl. Dep. at 148-49, 157.)

22. Purolite also has a "safety suggestions" box where employees may submit suggestions for the Plant. (Pl. Dep. at 166-67.)

### D. Purolite's Bid Process

23. When a position opens up, Purolite posts the opening and any employee may "bid" on the position by signing his or her name on the posting. (Pl. Dep. at 157, 170, 197.)

## II. Plaintiff's Employment with Purolite

### A. Overview of Mr. Gonzalez's Employment

24. On June 6, 2010, Purolite hired Mr. Gonzalez as an entry-level warehouse operator. (Pl. Dep. at 150, 190-91.)

25. On April 3, 2011, Purolite promoted Mr. Gonzalez to a Second Operator position in the Regen Department. (Pl. Dep. at 150-52).

26. As described in the job description, the physical requirements of the Second Operator – Regen position include: "Requires ability to sit and/or stand for extended periods of time, up to and including sixteen hours; walk, bend, reach, grasp, handle, push, pull, twist, kneel, squat, carry and lift uneven loads. Lift floor to waist, lift waist level and above, including overhead, up to and including 60 lbs. . . . Climb step stools, stairs, ladders and scaffolds." (Exh. 6.[6]) Mr. Gonzalez admitted these physical requirements were necessary for the Second Operator – Regen position. (Pl. Dep. at 155-56.)

---

[6] A true and correct copy of the Purolite's job description for Second Equipment Operator - Regen position is attached hereto as Exhibit 6, PUROLITE-000171-000172.

4

27. Mr. Gonzalez reported to Mr. Hernandez, Regen Department Supervisor, for the duration of his employment as Second Operator.  (Pl. Dep. at 157.)

28. Mr. Hernandez reported to Production Manager Tony Starkus ("Mr. Starkus") (Caucasian); Mr. Starkus report to Plant Manager Warner Jarnagin ("Mr. Jarnagin") (Caucasian).  (Pl. Dep. at 157-58.)

### B. Mr. Gonzalez Reports an Injury in September 2014

29. On September 16, 2014, Mr. Gonzalez claims to have suffered a back strain while operating the hand mixer in the Regen Department.  (Pl. Dep. at 175-76, 182.)

30. Mr. Gonzalez's doctor prescribed Lidocaine patches and stretching exercises for his back strain.  (Pl. Dep. at 183.)

31. Mr. Gonzalez did not have any work restrictions as a result of his back strain in September 2014.  (Pl. Dep. at 190.)

## III. Mr. Gonzalez Applies for Positions at Purolite

### A. Mr. Gonzalez Applies for a First Operator Position in October 2014

32. On October 29, 2014, Purolite posted a First Operator position in the Sulfonation Department.  (Pl. Dep. at 191; Exh. 7.[7])  Interested candidates had until November 5, 2014 to bid on the position.  (Pl. Dep. at 191; Exh. 7.)

33. Six employees bid on the position.  (Exh. 7.)  Purolite awarded the position to Don Cooper ("Mr. Cooper") (African American).  (Pl. Dep. at 194.)

34. Purolite originally hired Mr. Cooper on January 25, 2010; he therefore had more seniority than Mr. Gonzalez, whose employment began in June 2010.  (Pl. Dep. at 194.)

---

[7] A true and correct copy of the Purolite's job posting for 1st Operator Sulfination position is attached hereto as Exhibit 7, PUROLITE-000418.

5

35. Mr. Gonzalez did not consider himself to be more qualified than Mr. Cooper and testified he "put in a word" for him. (Pl. Dep. at 205.)

### B. Mr. Gonzalez Meets with Human Resources on November 4, 2014

36. On November 2, 2014, Mr. Gonzalez emailed Human Resources Manager Kelly Elmer ("Ms. Elmer") (Caucasian) to request a meeting. (Exh. 8.[8]) In the email, Mr. Gonzalez said "there seems to be some confusion with how policies are being applied" to the First Operator job posting. (Pl. Dep. at 196-97; Exh. 8.) Ms. Elmer responded: "My understanding is the most senior qualified candidate is usually the selected person for a position when there are more than one bidder for a position. I also believe that all candidates are interviewed that are qualified to bid. There is no written policy in our handbook on bidding a position." (Pl. Dep. at 196-97; Exh. 8.)

37. On November 4, 2014, Mr. Gonzalez met with Ms. Elmer in her office. (Pl. Dep. at 197-98.)

38. Mr. Gonzalez testified that he raised concerns about discrimination toward African American employees, and one in particular—Vernon Hill ("Mr. Hill") (African American). (Pl. Dep. at 199-200.)

39. Purolite promoted Mr. Hill to a First Operator position a few months prior. (Pl. Dep. at 203.)

40. Ms. Elmer testified that Mr. Gonzalez never mentioned discrimination or Mr. Hill in this meeting. (Elmer Dep. at 14-16, 26.[9]) Ms. Elmer did not interpret Plaintiff's concerns regarding promotions to be related to discrimination. (Elmer Dep. at 14-16.)

---

[8] A true and correct copy of the e-mail from Carlos Gonzalez to Kelly Elmer dated November 3, 2014 is attached hereto as Exhibit 8, PUROLITE-000190.

[9] A true and correct copy of the relevant portions of Kelly Elmer's Deposition ("Elmer Dep."), conducted on January 31, 2018, is attached hereto as Exhibit 9.

41. Ms. Elmer documented the notes from her meeting with Mr. Gonzalez on November 4, 2014. (Elmer Dep. at 13-14; Exh. 10.[10])

**C.  Mr. Gonzalez Applies for a Bulk Materials Handler Position in May 2015**

42. On May 4, 2015, Purolite posted an opening for a Bulk Materials Handler position. (Pl. Dep. at 213; Exh. 7.)

43. The Bulk Materials Handler position is desirable because of the pay; it is also a dayshift position (*i.e.*, it does not follow the four-day rotation between days and nights). (Pl. Dep. at 213-14.)

44. Seven employees bid on the position. (Exh. 11.[11])

45. Purolite awarded the positon to First Operator John Wisniewski ("Mr. Wisniewski") (Caucasian). (Pl. Dep. at 214, 216.)

**D.  Mr. Gonzalez Applies for a First Operator Position in May 2015**

46. On May 22, 2015, Purolite posted an opening for a First Operator position in the Sulfination Department. (Pl. Dep. at 220; Exh. 12.[12]) This position opened when Mr. Wisniewski moved to the Bulk Materials Handler position. (Pl. Dep. at 219-20.)

47. Six employees bid on the position. (Exh. 12.)

48. On June 1, 2015, Mr. Starkus interviewed Mr. Gonzalez for the position. (Pl. Dep. at 223-24.)

49. Mr. Gonzalez testified about the interview: "We talked about just the job and what it entailed and the money that it would be. I told him that, you know, I'm not here to

---

[10] A true and correct copy of handwritten notes by Kelly Elmer is attached hereto as <u>Exhibit 10</u>, PUROLITE-000189.

[11] A true and correct copy of the Purolite's job posting for Bulk Materials Handler position is attached hereto as <u>Exhibit 11</u>, PUROLITE-000424.

[12] A true and correct copy of the Purolite's job posting for 1st Operator Sulfination position is attached hereto as <u>Exhibit 12</u>, PUROLITE-000426.

7

negotiate. I didn't really feel it was appropriate for me to say, you know, how much that job was worth, and he got a little heated and said this is not a negotiation." (Pl. Dep. at 224.)

50. Purolite awarded the position to Mike Morgan ("Mr. Morgan") (Caucasian) who was a Second Operator in the Cation Department. (Pl. Dep. at 223.)

51. Mr. Starkus called Mr. Gonzalez to tell him he selected Mr. Morgan for the position. (Pl. Dep. at 226.)

### IV. Mr. Gonzalez Complains to Government Agencies

52. On June 11, 2015, Mr. Gonzalez sent an email to Ms. Elmer stating:

> "Good morning ms kelly. I just wanted to give you a heads up that I sent out the paper work [sic] to file a complaint with the labor department human relations commission. I am not scheduled to come back on day shift until June 22nd, so if you need me when [sic] can talk then. Just didn't want you to get the paperwork and feel a certain way about not hearing it directly from me. It's a topic we covered personally last year, so keeping it internal was no longer an option. My apologies."

(Exh. 13.[13])

53. Ms. Elmer responded to Mr. Gonzalez's email:

> "Okay, thank you for the heads up. I will contact my attorney so that I can be prepared for these charges when I am notified of the charges against me."

(Exh. 13.)

54. Mr. Gonzalez then responded:

> "Sounds good. But just so there is no confusion I am not making claims against you. Neither personally, for professionally. Either way, I'll talk to you in the plant if you need me ms."

(Exh. 13.)

---

[13] A true and correct copy of the e-mail from Carlos Gonzalez to Kelly Elmer dated June 11, 2015 is attached hereto as Exhibit 13, PUROLITE-000208.

8

55. Mr. Gonzalez further testified that the "topic we covered personally last year" referred to his meeting with Ms. Elmer on November 4, 2014. (Pl. Dep. at 247.)

56. In addition to the PHRC, Mr. Gonzalez also made complaints to:

- The Occupational Safety and Health Administration ("OSHA");
- The Philadelphia Department of Health, Air and Management Service;
- The Philadelphia Water Department; and
- The Environmental Protection Agency ("EPA").

(Pl. Dep. at 249-50, 262.)

57. Mr. Gonzalez testified he complained to OSHA about a leaking pressurized vessel, cracks in the floor, and caustic backing up into the water system. (Pl. Dep. at 253.) Cracks in the floor are obvious and Purolite repairs those. (Pl. Dep. at 256-57.) Purolite also addresses leaking from pressurized vessels when it occurs. (Pl. Dep. at 257.)

58. By the time the OSHA inspection took place, the items Mr. Gonzalez complained about had already been corrected pursuant to work orders that were already in place. (Jarnagin Dep. at 43.)

59. The complaints to the Philadelphia Water Department and EPA involved issues that the company was working on trying to resolve. (Pl. Dep. at 258-60, 262-63.)

60. Mr. Gonzalez's complaints to the PHRA, OSHA, the Department of Health, Air and Management Services, the Water Department, and the EPA were all made after Purolite awarded the First Operator position to Mike Morgan. (Pl. Dep. at 261, 264.)

61. No violations were found as a result of Mr. Gonzalez's complaints to government agencies. (Brodie Dep. at 29-30.)

**V.   Mr. Gonzalez Meets with Sal Briscella on July 3, 2015**

62. On July 3, 2015, Mr. Gonzalez met with Operations Manager Sal Briscella ("Mr. Briscella") (Caucasian). (Pl. Dep. at 158, 265; Briscella Dep. at 7.[14])

63. Mr. Gonzalez testified that, during this conversation, he raised an incident between two employees (Steve Heath and Maurice Nelson) which he believed Purolite mishandled. He testified the incident involved the use of the n-word. Mr. Gonzalez further testified that he considered this incident to be a "non-issue." (Pl. Dep. at 266-69.)

64. Also, during this conversation, Mr. Gonzalez admitted that he was responsible for calling OSHA. (Pl. Dep. at 271.)

65. Shortly after his conversation with Mr. Gonzalez, Mr. Briscella spoke with Mr. Jarnagin about his meeting with Mr. Gonzalez. Mr. Jarnagin and Ms. Elmer asked Mr. Briscella to memorialize his conversation with Mr. Gonzalez in an email. (Briscella Dep. at 18-19.)

66. On July 6, 2015, Mr. Briscella documented his conversation in an email to Ms. Elmer stating, in part:

> "Upon arriving in my office Carlos started the conversation by admitting he was responsible for the recent OSHA visit. After the admission Carlos began talking about a host of issues he has with Purolite management, to the best of my recollection I have listed some of his concerns below. (the list is in no particular order)
>
> - Lack of consistency regarding promotions. Carlos seems to believe Purolite applies different policies depending on who signed for the job posting.
>
> - Purolite mishandled the recent Steve Heath incident, claims that Steve may be subject to retaliation from other employees.
>
> - Claims that Steve is not the only employee who shows up for work under the influence of alcohol.
>
> - There is an atmosphere of intimidation on shift work.

---

[14] A true and correct copy of the relevant portions of Sal Briscella's Deposition ("Briscella Dep."), conducted on January 31, 2018, is attached hereto as Exhibit 14.

10

- Lack of specific training and written SOP's

- Miss-managed [sic] Vern Hill's promotion to first operator, lack of training and support led Vern to step down from the position. Carlos feels this was intentional in order to get Vern moved so the employee they really wanted for the position could begin could [sic] replace him.

- Claimed to have called the Dept. of Labor and made other vague claims about calls to other (I'm guessing) government agencies."

(Exh. 15.[15])

### VI. Mr. Gonzalez Reports a Back Injury on July 3, 2015

67. On the night of July 3, 2015, Mr. Gonzalez reported an injury to his back. (Exh. 16.[16])

68. The injury report on July 3, 2015 stemmed from Mr. Gonzalez's back strain in 2014. (Pl. Dep. at 280; Exh. 16.)

69. In the report, Mr. Gonzalez indicated that he had been suffering from the injury for a period of time before reporting it. (Pl. Dep. at 280; Exh. 16.)

70. Purolite sent Mr. Gonzalez to Concentra (medical provider) to have his back evaluated. (Pl. Dep. at 280.)

71. Concentra released Mr. Gonzalez to work with restrictions of: no repetitive bending, no lifting over 20 pounds, and no work with the resin mixer. (Pl. Dep. at 284; Exh. 17.[17])

---

[15] A true and correct copy of the e-mail from Sal Briscella to Kelly Elmer dated July 6, 2015 is attached hereto as Exhibit 15, PUROLITE-000226.

[16] A true and correct copy of the Incident/Injury Investigation Report dated July 3, 2015 is attached hereto as Exhibit 16, PUROLITE-000099-000101.

[17] A true and correct copy of the Physician Work Activity States Report for Carlos Gonzalez dated July 7, 2015 is attached hereto as Exhibit 17, PUROLITE-000089.

72. Mr. Gonzalez could not fully perform the Second Operator position with these restrictions. (Pl. Dep. at 286.)

73. When Mr. Gonzalez returned to work on July 8, 2015, he met with former Environmental Health and Safety Manager Ken Shaner ("Mr. Shaner") (Caucasian) and Mr. Starkus. (Pl. Dep. at 286.) Mr. Gonzalez testified that Mr. Starkus told him he did not believe he would "stick to [his] work restrictions and that [he] needed to go home and get some rest." (Pl. Dep. at 287.) In addition, Mr. Shaner and Mr. Starkus instructed Mr. Gonzalez to submit FMLA paperwork. (Pl. Dep. at 287, 373.)

74. Ms. Elmer then emailed Mr. Gonzalez. (Pl. Dep. at 288-89; Exh. 18.[18]) In her email, she explained "due to the restrictions relating to your current condition, we do not have work that is safe for you to do here at Purolite that falls within those restrictions." (Pl. Dep. at 289; Exh.18.) Ms. Elmer further advised Mr. Gonzalez that Purolite would file a claim with its workers' compensation carrier and that Purolite was sending FMLA paperwork. (Pl. Dep. at 290-91; Exh. 18.)

75. During this time, Mr. Gonzalez continued to work at his other job at Dialogic Fasteners. (Pl. Dep. at 291-92.)

76. Mr. Gonzalez testified that if he were to have continued working in the Second Operator position with his restrictions (no repetitive bending, no lifting over 20 pounds, and no work with the resin mixer) other employees would have had to perform parts of his job. (Pl. Dep. at 353-54.)

---

[18] A true and correct copy of the e-mail from Carlos Gonzalez to Kelly Elmer dated July 8, 2015 is attached hereto as Exhibit 18, PUROLITE-000209-000210.

**VII.   Mr. Gonzalez Complains of Harassment**

77.   On July 9, 2015, at 11:29 p.m., Mr. Gonzalez sent Ms. Elmer an email with the subject line "Harassment" stating:

> "Hi ms kelly.  Sorry to bother you so late.  I've been made aware of a situation, and I've been wrestling with how to address it for the past hour.  Unfortunately there is no other way than to go through you.  Usually I'd be more discrete considering the circumstances and all that.  But I really, really don't have a coded way to bring this to your attention.  Ernie was in shipping talking shit.  Apparently his position, and with the understanding that he isn't my supervisor, he was in shipping talking in front of multiple employees and a supervisor about how I needed to sent [sic] back to shipping for causing to many [sic]"

(Exh. 19.[19])

78.   Mr. Gonzalez testified he was out with a coworker, Mike Hayes ("Mr. Hayes") (Caucasian), who told him Production Manager Ernie Detweiler ("Mr. Detweiler") (Caucasian) said "they were going to send me back to Shipping from Regen for causing too many problems." (Pl. Dep. at 293-95.)

79.   A few minutes after his first email, Mr. Gonzalez sent a second email at 11:31 p.m., stating:

> "ill [sic] finish my statement on the record.  My iPhone sent the email before I was done.  Schedule a time I. The [sic] next few days for me to come see you."

(Exh. 20.[20])

**VIII.   Mr. Gonzalez Meets with Ms. Elmer at Purolite's Headquarters**

80.   The following day, on July 10, 2015, Ms. Elmer and Mr. Gonzalez exchanged emails to schedule a meeting per Mr. Gonzalez's request.  (Exh. 20.)

---

[19] A true and correct copy of the e-mail from Carlos Gonzalez to Kelly Elmer and Warner Jarnagin dated July 9, 2015 is attached hereto as <u>Exhibit 19</u>, Gonzalez-49.
[20] A true and correct copy of the e-mail from Carlos Gonzalez to Kelly Elmer dated July 10, 2015 is attached hereto as <u>Exhibit 20</u>, PUROLITE-000217-000219.

81. Mr. Gonzalez and Ms. Elmer scheduled the meeting for the afternoon of July 10, 2015, at Purolite's Bala Cynwyd headquarters. (Pl. Dep. at 308; Exh. 20.)

82. Ms. Elmer asked Mr. Gonzalez what outcome he wanted. Mr. Gonzalez testified: "By then I was just frustrated and I was just like, man, at this point everybody can just go fuck themselves. I'm taking this to a neutral environment and I am letting, you know, somebody else make a call on what this is." (Pl. Dep. at 314, 317.)

83. While Mr. Gonzalez was meeting with Ms. Elmer, he sent an email to Ms. Elmer to complete his "harassment" statement from the night before. (Pl. Dep. at 307; Exh. 21.[21])

84. Ms. Elmer took three pages of notes during the July 10 meeting with Mr. Gonzalez. Her notes are not a verbatim transcription of everything that was said during the meeting, as she was "trying to jot down" notes and "get as many notes" as she could. (Elmer Dep. at 28; Ex. 22.[22])

## IX. Purolite Terminates Plaintiff

85. After the July 10 meeting concluded, Ms. Elmer reviewed her notes with Vice President Jacob Brodie ("Mr. Brodie") (Caucasian). (Brodie Dep. at 28, 33.)

86. Ms. Elmer reported to Mr. Brodie that Mr. Gonzalez was very angry and erratic and that, when asked what outcome he wanted, he said for everybody to "go fuck themselves." (Brodie Dep. at 27-28.)

87. Mr. Brodie believed that Mr. Gonzalez wanted a negative outcome and therefore decided in that moment to terminate his employment. (Brodie Dep. at 28, 33.) Mr. Brodie perceived Mr. Gonzalez's comment to be a threat. (Brodie Dep. at 34.)

---

[21] A true and correct copy of the e-mail from Carlos Gonzalez to Kelly Elmer dated July 10, 2015 is attached hereto as Exhibit 21, Gonzalez-57-58.

[22] A true and correct copy of handwritten notes by Kelly Elmer is attached hereto as Exhibit 22, PUROLITE-000182-000184.

88. On July 15, 2015, Ms. Elmer emailed Mr. Gonzalez to request a phone call the following day.  (Exh. 23.[23])

89. On July 16, 2015, Mr. Jarnagin and Ms. Elmer spoke with Mr. Gonzalez on the phone and terminated his employment.  (Pl. Dep. at 331-32.)

90. Mr. Gonzalez testified that Mr. Jarnagin told him Purolite was terminating his employment because: (1) he told Ms. Elmer he wanted everyone to go fuck themselves; and (2) because he was trying to hurt the company by making bad faith claims to regulatory bodies.  (Pl. Dep. at 341-43.)  Mr. Jarnagin further testified that he considered Mr. Gonzalez's behavior during the July 10 meeting, and his statement to Ms. Elmer that he wanted everyone to go fuck themselves, to be a safety concern.  (Jarnagin Dep. at 39-41.)

## X.     Purolite Completes the Harassment Investigation

91. Following Mr. Gonzalez's termination, Purolite continued to investigate Mr. Gonzalez's harassment complaint concerning the alleged comment by Mr. Detweiler (saying Mr. Gonzalez would be sent back to shipping).  (Elmer Dep. at 35-41; Exh. 24.[24])

92. During the investigation, Ms. Elmer interviewed Joe Sullivan, Mr. Detweiler, Denzel Menzel, Jesus Mendoza, Jason Keene, and Mr. Hayes.  (Exh. 24.)

93. Ms. Elmer concluded no harassment had occurred.  (Elmer Dep. at 40-41; Exh. 25.[25])

94. Mr. Gonzalez was told that employees were being interviewed about his harassment complaint.  (Pl. Dep. at 307-08.)

---

[23] A true and correct copy of the e-mail from Carlos Gonzalez to Kelly Elmer dated July 15, 2015 is attached hereto as Exhibit 23, PUROLITE-000224-000225.

[24] A true and correct copy of handwritten notes by Kelly Elmer is attached hereto as Exhibit 24, PUROLITE-000176-000181.

[25] A true and correct copy of Note to File by Kelly Elmer is attached hereto as Exhibit 25, PUROLITE-000175.

15

## XI.     Plaintiff Submitted FMLA Paperwork After His Termination

95.     After his termination, Mr. Gonzalez submitted his FMLA paperwork.  (Pl. Dep. at 334; Exh. 26.[26])

## XII.    Plaintiff Files Complaints Against Purolite Post-Termination

96.     Following his termination, Mr. Gonzalez filed a complaint against Purolite with the Department of Labor and Compliance Industry because Ms. Elmer lawfully denied his request to view his personnel file.  (Pl. Dep. at 335-36.)

97.     Mr. Gonzalez also filed a retaliation complaint with OSHA.  (Pl. Dep. at 338.)

98.     OSHA found no violation by Purolite with respect to Mr. Gonzalez's retaliation complaint.  (Exh. 27.[27])

99.     Mr. Gonzalez also filed a Complaint with the PHRC on October 4, 2015, alleging ancestry discrimination, disability discrimination, and retaliation.  (Exh. 28.[28])

100.    Mr. Gonzalez's final rate of pay at Purolite was $17.01.  (Exh. 29 at p. 1.[29])

101.    On February 22, 2016, Mr. Gonzalez began full-time employment with Delta Mining Services making $17.50 per hour.  (Pl. Dep. at 30, 35, 57.)

102.    Mr. Gonzalez calculates his lost wages to be $23,201.00.  (Exh. 29 at p. 5.)

---

[26] A true and correct copy of Carlos Gonzalez's FMLA paperwork is attached hereto as <u>Exhibit 26</u>, PUROLITE-000074-000077.

[27] A true and correct copy of OSHA Findings dated March 27, 2017 is attached hereto as <u>Exhibit 27</u>, PUROLITE-000327-000333.

[28] A true and correct copy of Complaint filed with the PHRC dated October 4, 2015 is attached hereto as <u>Exhibit 28</u>, PUROLITE-000474-000478.

[29] A true and correct copy of Plaintiff's Answers to Defendant's First Set of Interrogatories dated November 4, 2017 is attached hereto as <u>Exhibit 29</u>.

|  |  |
|---|---|
|  | */s/ Leigh Ann Culpan* |
|  | Donald D. Gamburg, Esquire (PA No.: 76855) |
|  | Leigh Ann Culpan, Esquire (PA No.: 311228) |
|  | **OGLETREE, DEAKINS, NASH,** |
|  | **SMOAK, & STEWART P.C.** |
|  | 1735 Market Street, Suite 3000 |
|  | Philadelphia, PA 19103 |
|  | donald.gamburg@ogletreedeakins.com |
|  | leighann.culpan@ogletreedeakins.com |
|  | (215) 995-2800 (phone) |
| Dated: June 22, 2018 | (215) 995-2801 (fax) |

34589497.1