# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| CARLOS GONZALES, | : | |
| Plaintiff, | : | |
| | : | CIVIL ACTION |
| v. | : | |
| | : | NO. 17-2983 |
| PUROLITE CORPORATION, | : | |
| Defendant. | : | |

## MEMORANDUM

**Tucker, J.**                                                                                                **September __9th_, 2019**

      Before the Court is Defendant Purolite Corporation's Motion for Summary Judgment ("Motion") (ECF No. 15), Plaintiff Carlos Gonzalez's Response in Opposition (ECF No. 16), and Defendant's Reply (ECF No. 18). Upon careful consideration of the Parties' submissions and exhibits, and for the reasons set forth below, Defendant's Motion is DENIED.

## I. STATEMENT OF FACTS

      Purolite Corporation ("Defendant") is a Pennsylvania chemical manufacturing company with a domestic manufacturing site in Philadelphia ("Plant"). Concise Statement of Material Facts ("SOF") ¶ 1. ECF No. 15-1. Defendant manufactures ion exchange resin, a specialty product, used for water treatment and treatment of other liquids. SOF ¶ 2. The Plant has three production departments and each department employs First Operators and Second Operators. SOF ¶¶ 4–5. First Operators are higher-level positions. First Operators operate machinery and follow detailed operating and production procedures. SOF ¶¶ 6–7. Second Operator positions require more physical activity. Both positions are physically demanding. SOF ¶ 8.

Defendant hired Plaintiff Carlos Gonzalez ("Plaintiff") on June 6, 2010 as an entry-level warehouse operator. SOF ¶ 24. Defendant promoted Plaintiff to a Second Operator position on April 3, 2011. SOF ¶ 25. On October 29, 2014, Defendant announced an opening for a First Operator position. SOF ¶ 25. Employees apply for open positions by bidding or signing their name on the position posting. SOF ¶ 32. Plaintiff and five other employees bid on the First Operator position; an African American male was awarded the position. SOF ¶ 33. On May 22, 2015, Defendant announced another opening for a First Operator position. SOF ¶ 46. Six employees, including Plaintiff, bid on the position. SOF ¶ 47. Plaintiff was interviewed, however, Defendant chose another Second Operator, a Caucasian male, for the position. SOF ¶¶ 46–49.

**A. Plaintiff's Communications with Human Resources and His Supervisors; Plaintiff's Complaints to Government Agencies**

Over the course of his employment with Defendant, Plaintiff met with human resources and his supervisors to voice complaints regarding various workplace issues. Plaintiff also made formal complaints to several government agencies. On November 4, 2014, Plaintiff met human resources manager Kelly Elmer ("Elmer") to discuss his concerns about discrimination toward African American employees. SOF ¶ 37. Elmer does not recall Plaintiff mentioning discrimination and did not interpret Plaintiff's concerns regarding promotions to be related to discrimination. SOF ¶ 40. On June 11, 2015, Plaintiff emailed Elmer to give her a "heads up" that he filed a complaint with the Pennsylvania Human Relations Commission about a "topic [they] personally covered last year." SOF ¶ 52. Plaintiff also made complaints to the Occupational Safety and Health Administration, the Philadelphia Department of Health, Air and Management Services, the Philadelphia Water Department, and the Environmental Protection Agency.[1] SOF ¶

---

[1] Plaintiff's complaints addressed a leaking pressurized vessel, cracks in the floor and caustic backing up into the water system at the Plant. Defendant avers that it was working to resolve

56. On July 3, 2015, Plaintiff met with Operations Manager Sal Briscella ("Briscella"). SOF ¶ 62. Plaintiff discussed the following: (1) an incident between two employees that he believed Defendant mishandled—one of the employees used the n-word; (2) the complaints he filed with multiple government agencies; (3) employees showing up to work under the influence of alcohol; and (4) lack of consistency regarding promotions. SOF ¶¶ 63–65; Sal Briscella email to Kelly Elmer (July 6, 2015 12:42 P.M.), ECF No. 15-15.

### B. Plaintiff's Injury

On July 3, 2015, Plaintiff informed Defendant that he injured his back while operating a resin mixer.[2] Defendant sent Plaintiff to be evaluated by a medical provider. SOF ¶ 70. The provider released Plaintiff to work with the following restrictions: no repetitive bending, no lifting over twenty pounds, and no working with the resin mixer. SOF ¶ 71. The restrictions prohibited Plaintiff from fully performing the Second Operator position. SOF ¶ 72. Plaintiff returned to work on July 8, 2015. SOF ¶ 73. That day, he met with the Environmental Health and Safety Manager Ken Shaner ("Shaner") and Tony Starkus ("Starkus"), the Production Manager. SOF ¶ 73. Shaner and Starkus instructed Plaintiff to submit Family Medical Leave Act ("FMLA") paperwork because they believed Plaintiff should follow the work restrictions and go home to rest. SOF ¶ 73. Elmer later emailed Plaintiff explaining that Defendant does not have work that is safe for Plaintiff to perform in accordance with his restrictions. SOF ¶ 74. Elmer advised Plaintiff that Defendant would file a claim with its workers' compensation carrier and send FMLA paperwork to Plaintiff. SOF ¶ 74.

---

those issues. Def.'s Reply 5, ECF No. 18. The government agencies completed their investigations and did not find any violations. Def.'s Reply 5.

[2] It is unclear when Plaintiff suffered this injury. However, Plaintiff indicated in his injury report that he was suffering for a period of time before reporting to Defendant. SOF ¶ 69.

### C. Plaintiff's Termination on July 16, 2015

On July 9, 2015, Plaintiff emailed Elmer stating that Production Manager Ernie Detweiler ("Ernie") expressed to other employees that Plaintiff was causing too many problems. SOF ¶ 77. Elmer and Plaintiff met the following day at Defendant's headquarters. SOF ¶ 81. Elmer asked Plaintiff what he wanted out of the meeting, to which Plaintiff responded, "at this point everybody can just go fuck themselves," "I am taking this to a neutral environment, and I am letting you know, somebody else [will] make a call on what this is." SOF ¶ 82. After meeting with Plaintiff, Elmer met with Vice President Jacob Brodie ("Brodie"). SOF ¶ 85. Elmer shared her notes with Brodie and expressed to him that Plaintiff was very angry and erratic. SOF ¶ 86. Brodie interpreted Plaintiff's "go fuck themselves" comment to be a threat and decided to terminate Plaintiff's employment. SOF ¶ 87. On July 16, 2015, Elmer and Plant Manager Warner Jarnagin spoke with Plaintiff over the phone and terminated Plaintiff's employment. SOF ¶ 89.

Following his termination, Plaintiff filed a retaliation complaint with OSHA; the Pennsylvania Human Relations Commission, alleging ancestry discrimination, disability discrimination, and retaliation; and a complaint with the Department of Labor and Compliance Industry.[3] SOF ¶¶ 96–97, 99.

On July 3, 2017, Plaintiff initiated this suit against Defendant for alleged violations of Title VII of the Civil Rights Act of 1964 ("Title VII"), the Americans with Disabilities Act ("ADA"), the FMLA, the Pennsylvania Human Rights Act ("PHRA"), and the Pennsylvania Workers' Compensation Act. On June 22, 2018, Defendant filed this Motion, to which Plaintiff filed a response in opposition. Defendant's Motion is ripe for disposition.

---

[3] These complaints did not result in a violation or finding against Defendant. Def.'s Reply 2.

## II. STANDARD OF REVIEW

A court may grant a motion for summary judgment when the moving party shows "there is no genuine issue of material fact and . . . the moving party is entitled to judgment as a matter of law." *Jones v. School Dist.*, 198 F.3d 403, 409 (3d Cir. 1999) (citing Fed. R. Civ. P. 56(c)). An issue of material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The nonmoving party can defeat the motion by "going beyond the pleadings . . . and showing that there is a genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) (internal citation omitted). The court must review the motion in the "light most favorable to [the nonmoving party] and resolve all reasonable inferences in his favor." *Jones*, 198 F.3d at 409.

## III. DISCUSSION

Plaintiff filed the following claims against Defendant:

**Count I:** ADA violations based on discrimination, failure to accommodate and retaliation;
**Count II:** FMLA violations;
**Count III:** Title VII violations based on retaliation;
**Count IV:** Workers' compensation retaliation;
**Count V:** PHRA disability-based violations of discrimination, failure to accommodate and retaliation; and
**Count VI:** PHRA violations based on retaliation.

Plaintiff withdrew his FMLA claims and his disability-based ADA and PHRA claims for discrimination and failure to accommodate (Counts I, II, V). Pl.'s Mem. in Opp'n 1, ECF No. 16. The following claims remain:

**Count I:** ADA retaliation;
**Count III:** Title VII retaliation;
**Count IV:** Workers' compensation retaliation;
**Count V:** PHRA disability retaliation; and
**Count VI:** PHRA retaliation.

Defendant seeks summary judgment on the remaining counts arguing that Plaintiff cannot show that his termination was pretextual. For the reasons that follow, Defendant's Motion is DENIED.

### A. Title VII Retaliation Claim (Count III)

Title VII prohibits an employer from retaliating against an employee for assisting or participating in any manner in an investigation, proceeding, or hearing under Title VII. 42 U.S.C. § 2000e-3(a). To prevail on a Title VII retaliation claim, a plaintiff must either provide direct evidence of discrimination, as articulated in *Price Waterhouse v. Hopkins*,[4] or proceed under the *McDonnell Douglas Corp. v. Green's*[5] burden shifting framework. *Connelly v. Lane Constr. Corp.*, 809 F.3d 780, 787–88 (3d Cir. 2016) (The *Price Waterhouse* Court articulated the "mixed-motive theory" which explains that a "plaintiff may show that an employment decision was made based on both legitimate and illegitimate reasons." A plaintiff "may prevail by showing direct or circumstantial evidence that the challenged action resulted from discrimination.") (internal citations omitted)).

Under the *McDonnell Douglas* pretext theory, a plaintiff argues that the "employers stated justification for [the] employment decision is false." *Connelly*, 809 F.3d at 787. To prevail under the pretext theory, a plaintiff employee must show the following: (1) the plaintiff engaged in a protected work activity; (2) his employer took an adverse employment action against him; and (3) there was a causal connection between his participation in the protected activity and the adverse employment action. *Moore v. City of Phila.*, 461 F.3d 331, 340–41 (3d Cir. 2006). If a plaintiff proves all three elements, the burden shifts to the employer to provide a nonretaliatory reason for its actions. *McDonnell Douglas*, 411 U.S. at 802.

---

[4] *Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989).
[5] *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

Plaintiff's Complaint does not specify whether he intends to proceed under the mixed motive theory or the pretext theory, however, Plaintiff repeatedly argues the pretext theory in his response in opposition to Defendant's summary judgment motion. *See generally* Pl.'s Mem. in Opp'n, ECF No. 16. Furthermore, the record is devoid of direct evidence of retaliation. Accordingly, the Court's analysis will proceed under the *McDonnell Douglas* framework. *See Connelly*, 809 F.3d at 788 ("Whether a case is a pretext case, or a mixed-motive case is a question for the court once all the evidence has been received") (internal citation omitted).

It is undisputed that Plaintiff suffered an adverse employment action—Defendant terminated Plaintiff on July 16, 2015. Accordingly, elements one—engaging in a protected activity—and three—a causal connection between participation in the protected activity and Plaintiff's termination—remain at issue.

### 1. Participation in Title VII Proceedings; Opposition to Discrimination Made Unlawful Under Title VII

Plaintiff avers that he participated in Title VII proceedings and opposed discrimination made unlawful under Title VII. Pl.'s Mem. in Opp'n 6. Title VII's antiretaliation provision "protects those who participate in certain Title VII proceedings (the 'participation clause') and those who oppose discrimination made unlawful by Title VII (the 'opposition clause')." *Moore*, 461 F.3d at 341. "Whether the employee opposes, or participates in a proceeding against, the employer's activity, the employee must hold an objectively reasonable belief, in good faith, that the activity they oppose is unlawful under Title VII." *Id.* Plaintiff refers to his Pennsylvania Human Relations Commission ("PHRC") discrimination and retaliation complaint in support of his argument that he engaged in a protected activity.[6] A PHRC complaint, filed with a

---

[6] Plaintiff filed his PHRC complaint on October 4, 2015, three months after his termination. SOF ¶ 99.

7

Pennsylvania state agency, does not constitute a proceeding under Title VII. *See Connelly*, 809 F.3d at 792 n.10 (citing *Slagle v. Cty. of Clarion*, 435 F.3d 262, 268 (3d Cir. 2006) ("Protected activity must relate to employment discrimination charges brought under Title VII, implicating discrimination on the basis of race, color, religion, sex or national origin.")). Accordingly, the record is devoid of evidence of Plaintiff's participation in a Title VII proceeding prior to his termination.

> **i. Whether Plaintiff complained to Defendant regarding discrimination made unlawful under Title VII, is a genuine issue of material fact**

Plaintiff avers that he opposed discrimination made unlawful under Title VII when he complained to Defendant about (1) a co-worker using the n-word, (2) his production manager "talking shit," and (3) reoccurring discrimination and harassment employees experienced. Pl.'s Mem. in Opp'n 6; Pl.'s Statement of Disputed Facts ¶¶ 7–29, ECF No. 16-1. "Opposition to discrimination can take the form of informal protests of discriminatory employment practices, including making complaints to management." *Moore*, 461 F.3d at 343 (citing *Curay-Cramer v. Ursuline Acad. of Wilmington Del., Inc.*, 450 F.3d 130, 135 (3d Cir. 2006)). However, a plaintiff must "specifically complain" that he suffered unfair treatment in violation of Title VII. *See Barber v. CSX Distrib. Servs.*, 68 F.3d 694, 701–02 (3d Cir. 1995) (finding that plaintiff's complaint to human resources did not "constitute the requisite protected conduct for a prima facie case of retaliation" because the plaintiff "expressed his dissatisfaction that someone else was awarded [a] position," but did not specifically complain about age discrimination) (internal citation omitted)).

On July 3, 2015, Plaintiff complained to Briscella about an incident where an African American coworker called another African American coworker the n-word. Def.'s Reply 6.[7] Prior to July 3, 2015, Defendant investigated the incident and confidentially resolved the issues among the involved parties. Def.'s Reply 6. During the investigation, Elmer questioned Plaintiff about the incident. Pl.'s Dep. 266:9–18, ECF No. 15-6. Plaintiff testified that the questions upset him because he knew nothing about the situation because he was not there when it occurred. Pl.'s Dep. 266:9–18. Plaintiff believed Defendant mishandled this situation, however, Plaintiff testified that he considered the incident to be a non-issue. Pl.'s Dep. 266:9–18.

On July 9, 2015, Plaintiff emailed Elmer—the subject: "Harassment"—to request a time to speak about Detweiler "talking shit" about Plaintiff. SOF ¶¶ 77–84. Plaintiff and Elmer met the next day at Defendant's headquarters. SOF ¶ 81. According to Plaintiff, Detweiler stated that Plaintiff was causing too many problems and would be transferred back to his old position. Pl.'s Dep. 295:16–20. Plaintiff mentioned another coworker who Plaintiff viewed to be racist. Elmer Dep. 36:19–23, ECF No. 15-12. They also discussed Plaintiff's concerns regarding promotions.[8] Elmer testified that Plaintiff did not mention any form of discrimination regarding promotions, Detweiler's comments, or the alleged racist coworker. Elmer Dep. 16:1–15. Plaintiff avers that he complained to Elmer about discrimination and harassment and she memorialized his statements in her hand-written notes. Pl.'s Mem. in Opp'n 8–9. Plaintiff further argues that

---

[7] The Parties also discussed promotion and applicable policies, work atmosphere, employees working while under the influence of alcohol, and Plaintiff's contact with the Department of Labor and other government agencies. SOF ¶ 66, ECF No. 15-1; Email from Sal Briscella's to Kelly Elmer (July 6, 2015, 12:42 P.M.), ECF No. 15-18.

[8] Plaintiff and Elmer first met on November 4, 2014 to discuss promotion policies. SOF ¶¶ 36–41. Plaintiff testified that he complained about discrimination toward African American employees, specifically one African American coworker, Vernon Hill. Pl.'s Dep. 199:1–24, ECF No. 15-6. However, Elmer testified that Plaintiff never mentioned discrimination and Vernon Hill. Elmer Dep. 16:8–15; 26:1–4, ECF No. 15-12.

Defendant was aware of Plaintiff's complaints because Elmer informed the Plant manager of Plaintiff's complaints of discrimination and retaliation filed with the PHRC and the Department of Labor and Compliance Industry. Pl.'s Mem. in Opp'n 9.

It is clear from the evidence on the record that Plaintiff did not participate in a Title VII proceeding. Plaintiff's opposition to discrimination made unlawful by Title VII, however, remains at issue because the Parties present contrasting evidence. The Court cannot conclude, based on the evidence on the record, whether Plaintiff opposed discrimination made unlawful under Title VII. Thus, Plaintiff's engagement in a protected activity—element one—is a genuine issue of material fact. Accordingly, the Court need not review element three—causal connection between the protected activity and Plaintiff' termination. Summary judgment on Plaintiff's Title VII retaliation claim is denied.

### B. ADA Retaliation (Count I); PHRA Retaliation (Count VI); and PHRA Disability Based Retaliation (Count V)

Under the ADA, "it is unlawful to retaliate against an individual for opposing employment practices that discriminate based on disability, or for filing a discrimination charge, testifying or participating in any way in an investigation, proceeding or litigation under the ADA." 42 U.S.C.S. § 12203(a). From its plain language, the ADA not only protects those who are disabled, it also protects individuals who oppose any act or practice made unlawful by the ADA, or who made a charge under the ADA. *Shellenberger v. Summit Bancorp*, 318 F.3d 183, 188–89 (3d Cir. 2003) (a plaintiff's failure "to establish that [he] was disabled does not prevent [him] from recovering [under the ADA] if [he] can establish that [his] employer terminated [him] because he engaged under a protected activity under the ADA."). Accordingly, a plaintiff need not be disabled to proceed with an ADA retaliation claim.

The PHRA contains a similar antiretaliation provision. It forbids an employer from discriminating against an employee because he "made a charge, testified or assisted, in any manner, in any investigation, proceeding or hearing under th[e] act." 43 Pa. Cons. Stat. Ann. § 955(d).

Due to their similarity to Title VII, ADA and PHRA retaliation claims are analyzed under Title VII's *McDonnell Douglas* framework. *Shellenberger*, 318 F.3d at 189 (citing *Krouse v. American Sterilizer Co.*, 126 F.3d 494, 500 (3d Cir. 1997) ("[R]etaliation claims under the ADA are analyzed under the same framework as Title VII discrimination claims.")); *Marra v. Phila. House. Auth.*, 497 F.3d 286, 300 (3d Cir. 2007) ("[R]etaliation claims under . . . the PHRA typically proceed under the *McDonnell Douglas* framework.") (internal citation omitted). Accordingly, the Court's analysis of Plaintiff's ADA claim applies equally to Plaintiff's PHRA claims.

### 1. ADA and PHRA Claims Under the *McDonnell Douglas* Framework

To prevail on an ADA retaliation claim, a plaintiff must show that he (1) engaged in ADA protected activity; (2) he suffered an adverse action either after or contemporaneous with his engagement in the protected activity; and a (3) "causal connection between the . . . protected activity and the employer's adverse action." *Krouse*, 126 F.3d at 500. A plaintiff must present sufficient evidence to raise a genuine issue of material fact as to whether the defendant's proffered non-discriminatory reasons for his termination were pretextual. *Id.* at 504.

> **i. Plaintiff engaged in a protected activity when he requested accommodations; Plaintiff was terminated after he requested accommodations**

After he reported his back injury, Defendant sent Plaintiff to be evaluated by a medical provider. SOF ¶ 70. The provider released Plaintiff to work with restrictions that included light

lifting and no repetitive bending. SOF ¶ 71. Plaintiff understood that he could not perform his Second Operator duties under the restrictions and his co-workers would have to complete his work. SOF ¶¶ 72, 76. Defendant informed Plaintiff that it did not have work safe for him to do that fell within the restrictions. SOF ¶ 74. Plaintiff avers that he "unequivocally engaged in a protected activity insofar as he requested [] accommodation[s] in the nature of light duty work." Pl.'s Mem. in Opp'n 11.

Requests for accommodation can be "plain English" and "need not mention the ADA or use the phrase 'reasonable accommodation.'" *Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296, 313 (3d Cir. 1999) (internal citation omitted). The individual need not be disabled to request accommodation. *Shellenberger*, 318 F.3d at 191. When Plaintiff returned to work, he discussed his restrictions with Shaner, the environmental health and safety manager, and the production, manager, Starkus. SOF ¶ 73. Plaintiff's restrictions, and his discussions with Starkus and Shaner about his restrictions, constitute a request for an accommodation. Plaintiff was unable to perform his duties and informed Defendant of his limitations. Furthermore, after his meeting with Starkus and Shane, Elmer emailed Plaintiff stating that "due to . . . your current condition, we do not have work that is safe for you to do here that falls within [your] restrictions." Email from Kelly Elmer to Plaintiff (July 8, 2015), ECF No. 15-21. Elmer also stated that Defendant would file a workers' compensation claim and that she was sending FMLA paperwork to Plaintiff. Email from Kelly Elmer to Plaintiff (July 8, 2015).

This timeline is undisputed—Plaintiff requested accommodation on July 8, 2015 and Defendant terminated Plaintiff's employment on July 16, 2015. Plaintiff was terminated after he engaged in a protected activity, however, Plaintiff must show a causal connection between his request, and his subsequent termination.

### ii. Temporal proximity between Plaintiff's requested accommodations and termination creates an inference of causality

Courts must consider "a broad array of evidence" when analyzing the causal connection between a protected activity and adverse action. The Court must consider (1) "temporal proximity between the protected activity and the adverse action;" (2) "intervening antagonism or retaliatory animus;" (3) "inconsistencies in the employer's articulated reasons for terminat[ion];" or (4) "any other evidence in the record sufficient to support the inference of retaliatory aminus." *LeBoon v. Lancaster Jewish Comm. Center Ass'n*, 503 F.3d 217, 232 (3d Cir. 2007). Plaintiff's frequently rely on temporal proximity to prove the causal connection element; a court's ruling on the issue is context specific. *See Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 280 (3d Cir. 2000) (articulating that a court's ruling on temporal proximity is dependent on "how proximate the events actually were, and the context in which the issue came before the [court].") The issue surrounding temporal proximity is whether the time frame between the protected activity and adverse action is "unusually suggestive of a retaliatory motive." *Krouse*, 126 F.3d at 503. Temporal proximity is unusually suggestive, if "it is sufficient[,] standing alone to create an inference of causality and defeat summary judgment." *LeBoon*, 503 F.3d at 233. "When temporal proximity is not unusually suggestive the court must ask whether the "proffered evidence . . . may suffice to raise the inference." *Id.* (internal citation omitted).

Plaintiff argues that the causal connection between his requested accommodations and termination is evidenced by the proximity of the two events and the "clear pattern of antagonism and other evidence on the record." Pl.'s Mem. in Opp'n 12. The "other evidence" Plaintiff references, is Jarnigan's statement that Plaintiff might have fabricated his injury. Warner Jarnagin Dep. Ex. B, at 36:24, 37:1–4, ECF No. 16-2. Defendant argues Plaintiff's "behavior

during the July 10 meeting led to his termination and is an intervening event that distinguishes any temporal proximity." Def.'s Reply 22.

On July 10, 2015, Plaintiff met with Elmer at Defendant's headquarters to discuss the alleged harassment he suffered. SOF ¶ 81. Elmer described Plaintiff's demeaner as angry and erratic. SOF ¶ 86. When Elmer asked Plaintiff what he wanted from Defendant, Plaintiff said "at this point everybody can just go fuck themselves." Pl.'s Dep. 314:9–19. Elmer relayed the details of their conversation to Defendant's vice president, Jacob Brodie ("Brodie"). SOF ¶ 85. Brodie testified that Plaintiff "was a threat and a danger to [Defendant's] operations," and "wanted a negative outcome" from Plaintiff's complaints to regulatory agencies. Brodie Dep. 29:1–24; 30:1–24; 33:1–9. During his conversation with Elmer, Brodie decided to terminate Plaintiff. SOF ¶ 87. Defendant argues, that as a chemical manufacturing facility, it "could not take the chance that Plaintiff—who was angry and disgruntled—would harm himself, [Defendant], its employees or the surrounding neighborhood." Def.'s Reply 7. Defendant avers that a causal link between Plaintiff's request for accommodation and termination does not exist because Plaintiff was terminated for safety reasons and for making bad faith claims to government agencies. Def.'s Reply 10.

Plaintiff rejects Defendant's proffered reasons for his termination. Pl.'s Mem. in Opp'n 10–13. Plaintiff admits that he was frustrated during his meeting with Elmer. Pl. Dep. 314:14–19. However, Plaintiff argues, he "did not make any overt threats of harm, and . . . did not . . . say that he was intentionally making claims in bad faith." Pl.'s Mem. in Opp'n 11. Defendant concedes that Plaintiff did not make threats of physical violence against Defendant or its employees. Brodie Dep. 27:20–23. Regarding Plaintiff's formal complaints, Defendant avers that Plaintiff's complaints to government agencies pertained to routine issues that Defendant was in

14

the process of repairing. Def.'s Reply 11. Plaintiff did not report the issues to Defendant—which is required per Defendant's employee handbook—but reported directly to various regulatory bodies. Def.'s Reply 11. For this reason, Defendant characterized Plaintiff's complaint to government agencies as "claims in bad faith to intentionally cause harm to [Defendant]." Def.'s Reply 10

Here, Defendant terminated Plaintiff two weeks after he reported his injury, and one week after he requested accommodations. Such a short time frame is unusually suggestive. *See Williams v. Phila. Hous. Auth. Police Dept't*, 380 F.3d 751, 760 (3d Cir 2004) (comparing the two-day proximity in *Jalil v. Avdel Corp.*, and the two month proximity in the case before the court, the court held that the two month proximity was not unusually suggestive.); *Jalil v. Avdel Corp.*, 873 F.2d 701, 708 (3d Cir. 1989) (concluding that the two-day period between the plaintiff's engagement in the protected activity and adverse action was unusually suggestive and supported an inference of a causal connection.). Assuming the time frame, standing alone, was not unusually suggestive of retaliatory motive, the (1) multiple interactions the Parties had during those two weeks to discuss alleged work place harassment and discrimination, (2) Plaintiff's requested accommodations, and (3) Defendant's belief that Plaintiff complaints to government agencies were made in bad faith, create an inference of causality.

Plaintiff has proved all three elements of his ADA retaliation claim. The burden now shifts to Defendant to proffer a nonretaliatory reason for Plaintiff's termination. *Krouse*, 126 F.3d at 504. Defendant avers that Plaintiff was terminated for safety reasons and making bad faith claims to government agencies. Def.'s Reply 10. However, Defendant concedes that Plaintiff did not make any threats to harm Defendant or its employees. Brodie Dep. 27:20–23. Whether Defendant's reason for termination was legitimate and nondiscriminatory, remains at

issue and is a genuine issue of material fact. Accordingly, summary judgment on Plaintiff's ADA retaliation is denied.

### C. Workers' Compensation Retaliation Claim (Count IV)

Generally, an at will employee may not bring a cause of action against his employer for wrongful termination. *Geary v. United States Steel Corp.*, 318 A.2d 174, 180 (Pa. 1974). However, an at will employee may bring a wrongful termination claim under limited circumstances, "where the termination implicated a clear mandate of public policy." *Weaver v. Harpster*, 975 A.2d 555, 563 (Pa. 2009). Workers' compensation retaliation claims fall under the public policy exception. The Workers' Compensation Act prohibits an employer from firing an employee in retaliation for filing a workers' compensation claim. *Shick v. Shirey*, 716 A.2d 1231, 1237 (Pa. 1998). Workers' compensation retaliation claims are analyzed under the *McDonnell Douglas* burden shifting framework. *See Kieffer v. CPR Restoration & Cleaning Serv., LLC*, 200 F. Supp. 3d 520, 539 (E.D. Pa. Aug. 3, 2016); *Smith v. R.R. Donnelley & Sons Co.*, Civil Action No. 10-1417, 2011 U.S. Dist. LEXIS 105347, at * 9 (E.D. Pa. Sept. 16, 2011). Plaintiff must prove that (1) he engaged in a protected activity under the Workers' Compensation Act; (2) he suffered an adverse employment and (3) there exists a causal connection between the protected activity and the adverse action. *Kieffer v. CPR Restoration & Cleaning Servs., LLC*, 733 F. App'x 632, 638 (3d Cir. 2018).

### 1. Temporal proximity between Plaintiff's workers' compensation claim and termination creates an inference of causality

Plaintiff filed a workers' compensation claim—a protected activity— and received workers' compensation until he was cleared to return to work.[9] Pl.'s Dep. 289:17–24, 290:1–24, ECF No. 15-6. Plaintiff suffered an adverse employment action when Defendants terminated his employment on July 16, 2015. SOF ¶ 89. The only remaining issue is whether a causal connection exists between Plaintiff's protected activity and his termination. The Court's analysis in Section B.ii applies equally to Plaintiff's workers' compensation retaliation claims. The temporal proximity to Plaintiff's filing of his workers' compensation claim and his termination, is unusually suggestive and can support an inference of a retaliatory motive. Summary judgment on Plaintiff's workers' compensation claim is also denied.

## IV. CONCLUSION

For the foregoing reasons, Defendant's Motion for Summary Judgment is DENIED. An appropriate Order follows.

---

[9] It is unclear when Plaintiff returned to work. He testified that he received workers' compensation for a couple weeks and continued to receive compensation after his employment with Defendant ended. Pl.'s Dep. 290:10–22.